319 F.3d 1115
 Sandy GANWICH; Linda Hornbeck; Kila Hornbeck; Bryan Hornbeck; Tracy Ingram, individually and on behalf of her minor children; Treia Ingram; Reina Ingram; Harold W. Jones, aka Pete Jones; Mike Knox; Kimberly Sadler, Plaintiffs-Appellees,
v.
Ronald KNAPP, Defendant, and
Pierce County, Washington; Deborah Heishman, Defendants-Appellants.
Sandy Ganwich; Linda Hornbeck; Kila Hornbeck; Bryan Hornbeck; Tracy Ingram, individually and on behalf of her minor children; Treia Ingram; Reina Ingram; Harold W. Jones, aka Pete Jones; Mike Knox; Kimberly Sadler, Plaintiffs-Appellees,
v.
Ronald Knapp, Defendant-Appellant, and
Pierce County, Washington; Deborah Heishman, Defendants.
 No. 01-35677.
 No. 01-35694.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted September 12, 2002.
 Filed February 11, 2003.
 
 COPYRIGHT MATERIAL OMITTED Daniel R. Hamilton, Deputy Prosecuting Attorney, Tacoma, WA, for defendants-appellants Pierce County and Deborah Heishman.
 Timothy K. Ford and Maria C. Fox, MacDonald, Hoague & Bayless, Seattle, WA, for the plaintiffs-appellees.
 Daniel L. Judge and Michael P. Lynch, Asst. Attorneys General, Olympia, WA, for defendant-appellant Ronald Knapp.
 Appeal from the United States District Court for the Western District of Washington; Robert J. Bryan, District Judge, Presiding. D.C. No. CV-00-05566-RJB.
 Before BEEZER, GOULD and BERZON, Circuit Judges.
 GOULD, Circuit Judge.
 
 
 1
 When law enforcement officers investigate an organization suspected of criminal wrongdoing, they may not ignore the civil rights of the organization's employees. Although officers are entitled to act vigorously to gain information and to prevent the flight of the culpable, our Constitution requires that officers heed employees' rights in the process. This appeal raises such issues. We must decide whether law enforcement officers violated employees' Fourth Amendment rights by detaining them incommunicado without probable cause and using the threat of continued detention to coerce them to submit to interrogations. Considering the facts in the light most favorable to the employees,[1] we hold that the officers violated the employees' clearly established Fourth Amendment rights.[2]
 
 
 2
 * Most of the plaintiffs in this civil rights lawsuit are former employees of Ear-Tec Hearing Aid Specialists, a business that was under investigation for various fraudulent practices harmful to consumers. These employees were Sandy Ganwich, Linda Hornbeck, Tracy Ingram, Harold W. Jones, Mike Knox, and Kimberly Sadler.
 
 
 3
 On the morning of December 23, 1999, law enforcement officers arrived at the Ear-Tec offices in Puyallup, Washington, to serve a search warrant.[3] Soon thereafter, the officers corralled the plaintiffs in the Ear-Tec waiting room. The officers told the plaintiffs that they were not under arrest, but that they would be held in the waiting room until they submitted to individual interviews with police investigators in a back room. The officers prevented the plaintiffs from leaving the waiting room, from going to the restroom unattended, from retrieving their personal possessions, from making telephone calls, and from answering the office telephone when it rang.
 
 
 4
 The officers detained the plaintiffs in this severely restrained status for time periods ranging from one hour and forty-five minutes to four hours and forty-five minutes. They released the plaintiffs only after the plaintiffs submitted to tape-recorded interrogations.
 
 
 5
 When one of the plaintiffs, Linda Hornbeck, declined to make a statement after being brought to the back room, police detained her for another two and a half hours in the waiting room. They then brought her to the back room for questioning a second time. Hornbeck, concluding that she would not be released until she made a statement, submitted to the interrogation.
 
 
 6
 Also present at Ear-Tec when the officers served the search warrant were the four plaintiff children, ranging in age from seven to twelve years old, who had come to Ear-Tec with their parents for an office Christmas party. The officers refused to permit the children to leave the waiting room and prevented the children's parents from calling their spouses to retrieve the children. After about forty-five minutes, the officers permitted the children to leave with the adult daughter of another Ear-Tec employee.
 
 
 7
 If we credit the plaintiffs' affidavits, as we must at this stage, none of them had any knowledge of their employer's allegedly fraudulent trade and billing practices. Indeed, only two of the plaintiffs had worked at Ear-Tec more than two months.
 
 
 8
 The plaintiffs filed suit against Pierce County and two officers, Ronald Knapp and Deborah Heishman, under 42 U.S.C. § 1983. They allege that the incommunicado detention and coerced interrogations violated their Fourth Amendment rights and that denying them the use of a telephone violated their First Amendment and Fourteenth Amendment procedural due process rights.[4] The defendants moved for summary judgment on the grounds that the plaintiffs' rights had not been violated in any respect and that, even if there was a violation, the officers possessed qualified immunity from suit. The district court denied the defendants' summary judgment motions. This appeal followed.
 
 II
 
 9
 Before deciding the constitutional issues, we first must determine whether we have jurisdiction.
 
 
 10
 It is settled that a district court's denial of qualified immunity is an immediately appealable final decision under the collateral order doctrine. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Nevertheless, the plaintiffs argue that we lack jurisdiction to review the denial of qualified immunity because the district court's ruling occurred before the completion of discovery and expressly left the qualified immunity question open for reconsideration after the completion of discovery.[5] We reject that argument.
 
 
 11
 The Supreme Court in Behrens v. Pelletier, 516 U.S. 299, 308, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), held that a government officer could raise the qualified-immunity defense both before and after discovery, and that an order rejecting the defense at either stage is a "final" judgment subject to immediate appeal. The qualified immunity defense gives government officials a right not merely to avoid standing trial, but also to avoid the burdens of "such pretrial matters as discovery..., as [i]nquiries of this kind can be peculiarly disruptive of effective government." Id. (emphasis added) (internal quotations omitted).
 
 
 12
 Forcing the defendant officers to undergo discovery, without the possibility of appeal to us, would erode any qualified immunity to the burdens of discovery the officers might possess. We hold that the district court's denial of the officers' pre-discovery qualified immunity motion was an immediately appealable final judgment.[6]
 
 
 13
 We turn to the main issues in this appeal.
 
 III
 
 14
 Whether the defendant officers are entitled to summary judgment on the basis of qualified immunity depends on a two-step inquiry. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First, we inquire whether, in the light most favorable to the plaintiffs, the facts alleged show the officers' conduct violated a constitutional right. Id. Second, if the officers violated a constitutional right, we inquire whether that right was "clearly established" when viewed in the context of the case. Id.
 
 
 15
 * We begin with the adult plaintiffs' claims that the officers detained them in violation of the Fourth Amendment.
 
 
 16
 The Fourth Amendment says that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., Amend. IV. "Its central requirement is one of reasonableness." Illinois v. McArthur, 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (internal quotations omitted). Although some police conduct is per se unreasonable (such as making an arrest without probable cause), other police conduct is judged using a balancing approach. Some seizures are so much less intrusive than a traditional arrest that they may be reasonable, in light of the government's strong opposing interests in crime prevention and detection and in police officers' safety. See, e.g., Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (permitting a temporary stop and limited search for weapons based on less than probable cause).
 
 
 17
 This appeal fits within the category of cases in which it is appropriate to balance governmental and individual interests. The officers' seizure[7] of the plaintiffs was not based upon probable cause,[8] so the seizure was invalid unless special circumstances, on balance, justified it.
 
 
 18
 "[W]e balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." McArthur, 531 U.S. at 331, 121 S.Ct. 946. We conclude that, although it was reasonable to detain the plaintiffs on the Ear-Tec premises during the search of the building, it was not at all reasonable to condition the plaintiffs' release on their submission to interrogation.
 
 
 19
 Detaining the plaintiffs in the Ear-Tec waiting room during the search of the premises served important law enforcement interests. It prevented any of the Ear-Tec employees from fleeing in the event that incriminating evidence was found. It minimized the risk of harm to officers by ensuring that none of the employees were able to obtain a weapon. And it ensured that employees were on the premises to assist officers in case they needed (for example) a door or cabinet unlocked. On the other side of the balance, holding the plaintiffs in the waiting room worked no great invasion of privacy.
 
 
 20
 Because the important law enforcement interests in this conduct outweighed the plaintiffs' privacy rights, it was reasonable and, therefore, lawful under the Fourth Amendment. Indeed, the officers' holding the plaintiffs in the waiting room was precisely the conduct the Supreme Court deemed reasonable in Michigan v. Summers, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (holding that police officers may temporarily seize the occupants of a building, without probable cause, while the officers search that building for evidence pursuant to a valid warrant).[9]
 
 
 21
 But the officers did not merely require the plaintiffs to remain in the waiting room during the search. Rather, the officers told the plaintiffs, who already had been detained for more than an hour, that they would not be released until they submitted to individual interrogations. The officers then brought each plaintiff to a back room, where officers interrogated him or her. Although the defendants offer little explanation of what law enforcement interests this procedure might serve, it is plain that such questioning serves the government's proper interest in gathering information about allegedly criminal activities. This government interest may be important.[10] But it is not so important as to outweigh the plaintiffs' privacy rights, which the coerced interrogations severely invaded.
 
 
 22
 The officers' conduct in the back room closely resembled the custodial interrogation that might take place at a police station. We hold that this sort of coerced interrogation is a serious intrusion upon the sanctity of the person. It may inflict great indignity and arouse strong resentment. It may make the subject feel the target of the government's vast machinery, in grave legal peril, alone and without counsel. It may make the subject feel that dread consequences hang on his or her words.[11] It may make the subject feel that silence is not an option. The government surely has a legitimate interest in seeking voluntary cooperation from all. But the government conduct in this case intruded so severely on interests protected by the Fourth Amendment as to be unreasonable and, therefore, unlawful. Given the severity of the intrusion and the nature of the law enforcement interests at stake, the compelled interrogations of the plaintiffs were impermissible.[12]
 
 
 23
 Our holding is confirmed by another rule of Fourth Amendment law: A seizure becomes unlawful when it is "more intrusive than necessary." Florida v. Royer, 460 U.S. 491, 504, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The scope of a detention "must be carefully tailored to its underlying justification." Id. at 500, 103 S.Ct. 1319. Here, the defendants argue that the underlying justifications for detaining the plaintiffs were to prevent flight in the event incriminating evidence was found, to minimize the risk of harm to the officers, and to further the orderly completion of the search — the same justifications that made reasonable the seizures in Michigan v. Summers.[13] Although these considerations amply justified the officers' ordering the plaintiffs to remain in the waiting room during the search of the premises, they did not justify the officers' coercing the plaintiffs into submitting to interrogations. Therein the government's conduct went from fair to foul. The interrogations did not deter the plaintiffs' flight, did not reduce the risk of harm to officers, and did not assist the officers in the orderly completion of the search. Because the interrogations of the plaintiffs were not carefully tailored to the detention's underlying justification, the detention was more intrusive than necessary. This rendered the detentions unlawful.
 
 
 24
 Our analysis tracks the Supreme Court's analysis in Florida v. Royer. In Royer, police suspected a man was transporting narcotics through an airport. 460 U.S. at 491, 103 S.Ct. 1319. Because police did not have probable cause to arrest the man, they "stopped" him in the concourse to ask him some questions. 460 U.S. at 502, 103 S.Ct. 1319. This brief Terry-type seizure was permissible under the Fourth Amendment because of the need quickly to verify or dispel officers' suspicion that criminal activity was afoot. Id. But then, as here, the officers went further. The officers removed the man to a small police room for further questioning. Id. This conduct, the Supreme Court held, violated the Fourth Amendment. "The record does not reflect any facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing Royer to the police room," the Court wrote. Id. at 505, 103 S.Ct. 1319. Because "the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the Terry line of cases," it violated the Fourth Amendment. Id. at 504, 103 S.Ct. 1319.
 
 
 25
 As in Royer, the legitimate law enforcement purposes that justified the detention of the plaintiffs in this case — purposes that related to the need to control the premises during the search — were not furthered by removing the plaintiffs to back rooms to be interrogated.
 
 
 26
 An additional aspect of the officers' conduct was objectionable under the Fourth Amendment: their preventing the plaintiffs from making a telephone call for extended times during the detention. It follows from Royer that officers may prevent temporary detainees from using a telephone only so long as that restriction is "carefully tailored to its underlying justification." See Royer, 460 U.S. at 500, 103 S.Ct. 1319. Here, it does not appear that the officers' depriving the plaintiffs of telephone access could be justified by legitimate law enforcement interests for more than a fraction of the detention.
 
 
 27
 The officers argue that they had a legitimate law enforcement interest in preventing the plaintiffs from warning other Ear-Tec offices of the investigation, for fear that conspirators would destroy evidence at other offices.[14] That is a legitimate interest but a short-lived one. If the officers searched other Ear-Tec offices at about the same time as they searched the Puyallup office, then the need to restrict the plaintiffs' communications to prevent the destruction of evidence disappeared once the searches of the other sites was underway. See Leveto v. Lapina, 258 F.3d 156, 171 (3d Cir.2001) (noting that the need to detain an individual during a search to prevent the destruction of evidence at another location is minimized once a search in the other location is underway). On the other hand, if the officers searched other Ear-Tec offices after they concluded their search of the Puyallup office, then restricting the plaintiffs' telephone use was almost pointless: the plaintiffs could warn conspirators at the other offices of the investigation once they were released. In either case, the officers' interest in holding the plaintiffs incommunicado to prevent destruction of evidence appears to be slight, at least at this summary judgment stage where all favorable inferences are given the plaintiffs.
 
 
 28
 The officers may have had some (conjectural) interest in preventing the plaintiffs from summoning armed assistance from others. But that already speculative interest became too weak to justify restricting communications after the first Ear-Tec employee was released one hour and forty-five minutes into the search. Because that employee, or any of the other employees who were released subsequently, could have summoned the assistance of allies, if any existed, the law enforcement officers' interest did not justify the four hour and forty-five minute deprivation of telephone access. See Leveto, 258 F.3d at 171-72(noting that an eight-hour incommunicado detention was unreasonable under the Fourth Amendment).
 
 
 29
 Even if at the start the officers had an interest in preventing the plaintiffs from making a telephone call, the officers' interest was soon outweighed by the plaintiffs' stronger interests in contacting relatives. For example, certain plaintiffs needed to use the telephone to contact their spouses or other family members to arrange for the care of their children. Others may have needed to use the telephone to explain to relatives their apparent disappearance. Because the defendants held the plaintiffs incommunicado so long, the plaintiffs may have suffered unreasonable inconvenience. When officers try to justify a significant restraint with so weak a rationale, their conduct is not permissible under the Fourth Amendment.
 
 
 30
 Under the circumstances of this case, the officers' holding the plaintiffs incommunicado and using their continued detention to coerce them into submitting to interrogations was not "carefully tailored" to the justification underlying a Summers-type detention.[15] The officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by Summers, so it was not reasonable under the Fourth Amendment.[16]
 
 
 31
 Having determined that the officers violated the plaintiffs' Fourth Amendment rights, we turn now to the second step in the qualified immunity analysis: We ask whether the right was "clearly established." Saucier, 533 U.S. at 201, 121 S.Ct. 2151. The relevant inquiry in determining whether a right was clearly established is whether it would be clear to a reasonable officer that his or her conduct was unlawful in the situation confronted. Id. at 202, 121 S.Ct. 2151. We hold that a reasonable officer would have known that, absent probable cause to arrest, the Constitution prohibits officers from using the threat of continued detention to coerce detainees to submit to interrogation and prohibits officers from holding people incommunicado for this length of time without better justification.
 
 
 32
 When the officers seized the plaintiffs by detaining them in the waiting room, well-known and indisputable Fourth Amendment principles should have been known to the officers: First, officers normally may not seize a person absent probable cause, except in a handful of well-defined situations. See Skinner v. Railway Labor Execs. Ass'n, 489 U.S. 602, 619-620, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Second, the type of seizure here has never been recognized as one of those well-defined situations. Indeed, the Supreme Court in Michigan v. Summers stated that detaining building occupants during a search of the premises was reasonable because "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." 452 U.S. at 701, 101 S.Ct. 2587. Yet here the officers did precisely what the Summers Court warned was improper: the officers exploited the detention, prolonging it to gain information from the detainees, rather than from the search. When the officers made plans to detain the plaintiffs with no probable cause to arrest, they should have recognized that they were treading on thin constitutional ice, albeit ice that could bear their weight. When the officers ventured further to exploit that legitimate detention by holding the plaintiffs incommunicado and coercing them into submitting to interrogations, they should have recognized that the ice would not bear their weight.
 
 
 33
 The officers also should have known that a seizure becomes unlawful when it is more intrusive than necessary to accomplish the objectives that justified the seizure in the first place. Royer, 460 U.S. at 504, 103 S.Ct. 1319. The officers should have recognized that the manner in which they conducted the seizure was significantly more intrusive than was necessary for them to complete the search of the Ear-Tec premises. Terry, 392 U.S. at 28, 88 S.Ct. 1868 ("The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all.").
 
 
 34
 It may be argued that judges should not expect police officers to read United States Reports in their spare time, to study arcane constitutional law treatises, or to analyze Fourth Amendment developments with a law professor's precision. We do not expect police officers to do those things. We do, however, expect officers to think twice before embarking on a course of conduct, such as the one here, that is unusual, unfair, and unduly coercive. When the officers seized the plaintiffs, with no probable cause to arrest them, and then used the threat of continued incommunicado detention to coerce them to submit to police interrogation, the officers exceeded the generous leeway that the qualified immunity doctrine allows.
 
 
 35
 We hold that Pierce County is not entitled to summary judgment and that the defendant officers are not entitled to qualified immunity from this claim. The adult plaintiffs' evidence, if credited, would show that a genuine issue of material fact exits concerning whether the officers violated the plaintiffs' clearly established Fourth Amendment rights.[17]
 
 B
 
 36
 Finally, the defendants argue that the officers' conduct never implicated the plaintiff children's Fourth Amendment rights because the officers never "seized" the children.
 
 
 37
 "[A] person has been `seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Here, the children claim that officers told them to move from a back room to the waiting room, where they were made to remain with their parents for approximately forty-five minutes. Officers made sure the children did not leave the waiting room. Under these circumstances, a reasonable person of any age would believe that he or she was not free to leave, and thus a "seizure" occurred within the meaning of the Fourth Amendment.[18]
 
 
 38
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Because this is an appeal from the denial of a summary judgment motion, we must view the evidence in the light most favorable to the non-moving partyOliver v. Keller, 289 F.3d 623, 626 (9th Cir.2002).
 
 
 [2]
 The employees may assert their Fourth Amendment rights against state officers because the Fourth Amendment was made applicable to the states by the Fourteenth Amendment's Due Process ClauseSee, e.g., Baker v. McCollan, 443 U.S. 137, 142, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).
 
 
 [3]
 The Pierce County Superior Court later determined that the search warrant was invalid as overbroad. We need not and do not consider the effect of the search warrant's invalidity (if, indeed, it was invalid) on the constitutionality of the defendants' seizure of the plaintiffs because we decide on other grounds that the seizure violated clearly established Fourth Amendment law
 
 
 [4]
 The plaintiffs also alleged that the interrogations violated their Fifth Amendment rights. But that claim is not at issue in this appeal
 
 
 [5]
 The plaintiffs also argue that we lack jurisdiction because the defendants' appeal is premised on disputes with the district court's view of the facts, not just its rulings of law. To the extent that the defendants' arguments quibble with the district court's view of the facts, we do not consider them. We view the evidence in the light most favorable to the plaintiffsOliver, 289 F.3d at 626.
 
 
 [6]
 We have pendent party jurisdiction over defendant Pierce County's appeal because our decision on the individual officers' qualified immunity claims necessarily will decide whether Pierce County is entitled to summary judgment on the merits of the constitutional questionsSee Streit v. County of Los Angeles, 236 F.3d 552, 559 (9th Cir.2001).
 
 
 [7]
 It is undisputed that the adult plaintiffs were "seized" within the meaning of the Fourth Amendment. We assume, without deciding, that the plaintiffs' detention here did not mature into a full-fledged arrest. The plaintiffs have not attempted to argue, either in the district court or before us, that the officers arrested them. They have cited no judicial decisions that address the question of when a detention matures into an arrest, and throughout their briefs they refer to their seizure as a "detention" rather than as an "arrest" or as being taken "into custody." By contrast, they refer to the seizure of Ear-Tec owner Shahn Divorne, who is not a plaintiff here, as his being "taken into custody and brought to the parking lot ... in handcuffs."See Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (equating "in custody" with "a formal arrest"). We ordinarily will not consider an issue that was not presented to or decided by the district court. S.D. Myers, Inc. v. City & County of San Francisco, 253 F.3d 461, 473 (9th Cir.2001). Moreover, we ordinarily will not consider matters that are not specifically and distinctly argued in the briefs. Seven Words LLC v. Network Solutions, 260 F.3d 1089, 1097 (9th Cir.2001). Rather than consider, in the first instance and without briefing, whether the plaintiffs were arrested, we borrow the plaintiffs' terminology and assume that the plaintiffs were "detained" but not "arrested."
 
 
 [8]
 The defendants did not argue to the district court or in their opening brief on appeal that probable cause supported the seizures of the plaintiffs, so we do not consider that argumentSee S.D. Myers, 253 F.3d at 473 (holding that we ordinarily will not consider an issue not presented to or decided by the district court), and Kim v. Kang, 154 F.3d 996, 1000 (9th Cir.1998) (holding that we ordinarily will not consider an issue that was not specifically and distinctly argued in appellant's opening brief).
 
 
 [9]
 The detention of building occupants during the execution of a search warrant may become unreasonable if it lasts too long. We cannot tell whether the detention during the execution of the warrant was too long in this instance, as the officers did not limit their activities to executing the warrant. It is therefore impossible to tell whether the duration of the detention would have been reasonable had the officers properly restricted their activities during the detention
 
 
 [10]
 The Supreme Court inSummers implied that questioning witnesses is not a legitimate justification for a Summers-type detention. The Court stated that a Summers-type detention is not unreasonable under the Fourth Amendment because it "is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." Summers, 452 U.S. at 701, 101 S.Ct. 2587. This implies that any law enforcement interest in gaining information from detainees during a Summers-type detention, independent from the law enforcement interest in searching a premises, does not justify their detention absent probable cause.
 
 
 [11]
 We are reminded of the custodial interrogation that took place inFlorida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). There, the officers
 requested [Royer] to accompany them to the[airport] police room. Royer went with them. He found himself in a small room — a large closet — equipped with a desk and two chairs. He was alone with two police officers who again told him that they thought he was carrying narcotics. He also found that the officers, without his consent, had retrieved his checked luggage from the airlines. What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions. The officers had Royer's ticket, they had his identification, and they had seized his luggage. Royer was never informed that he was free to board his plane if he so chose, and he reasonably believed that he was being detained. At least as of that moment, any consensual aspects of the encounter had evaporated.
 Id. at 502-03, 103 S.Ct. 1319.
 
 
 [12]
 The defendants argue that the officers possessed individualized suspicion that each adult plaintiff had committed a crime. But the record does not bear out that argument. Rather, the record shows that the officers suspected thatsome Ear-Tec employees had committed crimes. But even if individualized suspicion existed, it would not have justified the officers' coercing the plaintiffs into back-room interrogations. See Royer, 460 U.S. at 502, 103 S.Ct. 1319(holding that moving a criminal suspect from the concourse to a nearby police room for questioning was "a more serious intrusion on ... personal liberty than is allowable on mere suspicion of criminal activity").
 
 
 [13]
 We do not consider the officers' subjective motivationsSee, e.g., Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (precedent "foreclose[s] any argument that the constitutional reasonableness of [a] traffic stop depends on the actual motivations of the individual officers involved"). Rather, we determine that the considerations that justify the seizure of a building's occupants in general, viewed objectively, do not justify the further step of using the seizure to coerce those occupants into submitting to interrogations.
 
 
 [14]
 The defendants applied for a warrant to search three Ear-Tec locations and owner Shahn Divorne's home. It is not clear from the record when the officers intended to conduct the other searches
 
 
 [15]
 Our approach here accords with courts' repeated recognition thatSummers grants the police only limited powers to detain building occupants. See, e.g., Heitschmidt v. City of Houston, 161 F.3d 834, 837-38 (5th Cir.1998) (holding that handcuffing and denying a plaintiff bathroom breaks during the search of his residence was not within the scope of a permissible detention under Summers); Alexander v. City and County of San Francisco, 29 F.3d 1355, 1363 (9th Cir.1994) (citing Summers, 452 U.S. at 705, 101 S.Ct. 2587) (emphasizing officers' "limited authority to detain" occupants in a Summers search); Franklin v. Foxworth, 31 F.3d 873, 876 (9th Cir.1994) (stating that detentions during a Summers search must be conducted in a reasonable manner to comport with the Fourth Amendment); Mena v. City of Simi Valley, 226 F.3d 1031, 1039-41 (9th Cir.2000) (same).
 
 
 [16]
 Because we hold that the officers' holding the plaintiffs incommunicado violated their Fourth Amendment rights, we need not decide whether that conduct also violated their First Amendment or Fourteenth Amendment due process rights
 
 
 [17]
 Defendant Deborah Heishman argues that she cannot be liable because there was an insufficient causal connection between her conduct and the constitutional violation. Considering the facts in the light most favorable to the plaintiffs, we disagree. The record suggests that Heishman was involved both in the planning and execution of the plaintiffs' seizure
 
 
 [18]
 Of course, the mere fact that the children were "seized" does not mean that their seizure was unreasonable under the Fourth Amendment. We express no opinion as to whether the seizure of the children was unreasonable. That issue is for the district court to decide in the first instance