Dimitris DESYLLAS, Plaintiff–
Appellant,

v.

Daniel BERNSTINE;  Roderic Diman;
John Fowler;  Rick Roe,
Defendants–Appellees.

No. 02–35374.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 12, 2003.

Filed Dec. 9, 2003.

Philip M. Lebenbaum, Hollander, Lebenbaum & Gannicott, Portland, OR, for plaintiff-appellant.

Daniel J. Casey, Assistant Attorney General, Salem, OR, for defendants-appellees.

Before ALDISERT,* GRABER and GOULD, Circuit Judges.

ALDISERT, Circuit Judge.

Dimitris Desyllas, a student newspaper editor at Portland State University ("PSU"), appeals the district court's order granting summary judgment to four university officials on Desyllas's 42 U.S.C. § 1983 claims for violation of his First and Fourth Amendment rights. We must decide whether the district court correctly concluded that the university officials were entitled to qualified immunity. We conclude there was no error and affirm.

The United States District Court for the District of Oregon had jurisdiction in the underlying action pursuant to 28 U.S.C. §§ 1331 and 1343 based on Desyllas's claims under 42 U.S.C. § 1983. We have jurisdiction to review the district court's grant of summary judgment in favor of the university officials pursuant to 28 U.S.C. § 1291.

I.

In December 2000, Desyllas, editor of a PSU student newspaper called the *Rearguard,* found a box of confidential student records outside the *Rearguard* office in the Smith Memorial Center on campus. An anonymous note suggested that he "would know what to do with" the records. Desyllas thumbed through some of the records and, realizing their confidential nature, locked the files in a cupboard inside the newspaper office and then consulted an attorney at the Student Press Law Center.

Desyllas eventually compiled an electronic summary of the contents of the errant box. He said that he prepared this summary as part of an investigation for a news story, which he never finished, and he included student names and descriptions of disciplinary and other personal records. Among the records were approximately 25 files on PSU students from 1978 to 1991. The box contained mental health assessments, medical records and records of disciplinary action for student misconduct such as possession of illegal drugs and firearms, plagiarism, unlawful sexual intercourse with a minor and sexual harassment. He found a notation inside the box: "To Be Destroyed."

Although he had vague plans to write a news story about the university's failure to keep the records confidential, he took no public action regarding the records for several months. On February 23, 2001, he wrote a letter delivered by a fellow student to PSU President Daniel Bernstine advising that "[t]he *Rearguard* collective" possessed the records and would "be going forward with a press release on this matter within the next two weeks." He did not indicate that he intended to publish a news story in the newspaper, which has a sporadic publication schedule and no set deadlines, nor did he attempt to interview Bernstine about how the records left the university's possession.

A.

When he received Desyllas's letter on the afternoon of February 23, 2001, Bernstine feared that release of the confidential information would subject the university to liability under federal and state

* Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

law. Bernstine and two other university officials, Special Assistant to the President Rod Diman and Public Safety Director John Fowler, immediately sought legal advice from the Oregon Department of Justice.

Special Assistant Attorney General Melinda Grier concluded that the box of records had been stolen and advised Bernstine, Diman and Fowler to retrieve the records from the *Rearguard* office. Grier advised that, as president of the university, Bernstine had absolute authority to enter any portion of the state-owned Smith Center, including the *Rearguard* office, or to lock the office door to ensure no one carried away the records. Grier suggested that Bernstine, Diman and Fowler attempt to convince Desyllas to return the records. Alternatively, Grier said, a search warrant could be obtained. Grier did not advise PSU officials that they could detain or arrest Desyllas.

After the telephone conversation with Grier, at 4:06 p.m., Bernstine instructed Diman and Fowler to retrieve the records in accordance with Grier's advice. Accompanied by Sergeant Mike Soto, who was a uniformed campus police officer, Diman and Fowler approached the *Rearguard* office and found it empty and locked. Fowler instructed Soto to secure the door with a "clam shell" lock, a device that fits over a doorknob and prevents access. Thereafter, Fowler and Diman located Desyllas one floor up in the Smith Center at the student government office and asked to speak with him.

Desyllas consented but requested that they remain in the student government office, where other students were present. When Fowler asked Desyllas to return the records, Desyllas lied. He said that the records were not in the newspaper office and that the records were not in a place where he could be taken to retrieve them.

Moreover, he told Fowler and Diman that he realized the records were university property and that he ultimately intended to return the records, but that he needed the files temporarily in order to complete a news story.

Fowler told Desyllas that Desyllas could be arrested for possession of stolen property and that police could obtain a search warrant to attempt to retrieve the records from the *Rearguard* office. During this conversation, Soto arrived to inform Fowler that Soto had requested another officer to bring a key for the clam shell lock. Two police officers on bicycles were visible through a window of the student government office.

Desyllas requested that he be allowed to telephone his newspaper advisor and a lawyer. Fowler ordered Soto to accompany Desyllas to the *Rearguard* office to unlock the clam shell lock so Desyllas could enter. Soto remained in the hallway and doorway outside the office, conversing with another officer while Desyllas used the telephone. Desyllas failed to reach his advisor but did speak with a lawyer for about 15 minutes. Desyllas and Soto then returned to the student government office, where they were met by Diman and Fowler. Desyllas told Diman and Fowler that Desyllas wanted to wait an hour and try again to reach his advisor and another lawyer.

According to Desyllas, Fowler replied that "we can stay here all night or wait here all night if we have to." Desyllas was not told that he was not free to leave.

After a short wait in the student government office, Desyllas stated that he wanted to go outside to smoke a cigarette. He left with student body president Bar Johnston, who had witnessed the events in the student government office, and with Soto, who was acquainted with Desyllas from

their joint participation at several previous campus events. Desyllas once had nominated Soto for an award from the *Rearguard* for outstanding work with students.

Once outside, Soto asked Desyllas for a cigarette. While smoking outside, Soto and Desyllas discussed the box of records and Desyllas jokingly asked if Soto wanted to go have a beer.

Johnston and Desyllas then walked out of Soto's earshot, although the two students remained in Soto's view. After a short conversation between Desyllas and Johnston, student editor Desyllas informed Soto that Desyllas would turn over the box of records. Desyllas and Soto then told Diman and Fowler and retrieved the records from the *Rearguard* office. Bernstine called Grier at 5:14 p.m. to say the records had been returned.

Desyllas filed a Complaint against Bernstine, Diman, Fowler and PSU in the United States District Court for the District of Oregon on March 16, 2001. Desyllas alleged that PSU officials unlawfully detained him and seized his property but not that PSU officials engaged in prior restraint of speech by censoring news or thwarting publication of news.

### B.

On the morning of March 19, 2001, PSU student Kimmy Beemon posted fliers at various points around campus announcing Desyllas's 3 p.m. press conference to discuss his lawsuit against university officials. Beemon was accompanied by student Jeremy Rosenbloom, who posted fliers for a Students for Unity movie night.

After posting fliers on columns between the Smith Center and Neuberger Hall, Rosenbloom observed PSU public safety officer Joseph Widner removing fliers announcing the press conference and the movie night. Rosenbloom said that Widner took down only the press conference and movie night fliers while leaving other fliers. Upset that Widner disposed of the fliers without recycling them, Rosenbloom confronted Widner and had a discussion about recycling. When Rosenbloom returned to the area about one hour and 50 minutes later, all the fliers—not limited to the press conference and movie night fliers—that had been on the columns were gone. There is no evidence regarding who removed the fliers after Rosenbloom left the area.

Rosenbloom said that in other areas of campus, fliers for the press conference and movie night were removed from hallways and doorways although fliers announcing other events remained. Again, there is no evidence about who made these selective removals.

PSU's "Bulletin Board Posting Policy" states in part:

> In general, it is not appropriate to post posters, banners or other materials in buildings, on doors, walls, elevators or other areas of the campus that are not designated bulletin boards. Doing so causes damage to paint and windows and in most cases, your poster will be taken down by custodial staff.... All users are prohibited from posting any item on any unapproved surface, including walls, doors, windows, elevators, floors or entry-ways. An identified campus department or unit administers all university boards. Users must obtain proper approval before posting any item on any board, and must follow applicable guidelines.

### C.

Desyllas filed a Second Amended Complaint against Bernstine, Diman, Fowler and "Rick Roe" on May 23, 2001. The Second Amended Complaint alleged under

42 U.S.C. § 1983 that the Appellees violated Desyllas's right to be free from unlawful detention, right to be free from unlawful seizure of property, right to freedom of the press and right to freedom of speech. "Rick Roe" was later identified as Widner.

The Appellees filed a motion for summary judgment based on qualified immunity on October 19, 2001. The magistrate judge granted the motion and dismissed the Second Amended Complaint with prejudice on February 28, 2002. Desyllas filed a timely Notice of Appeal.

## II.

We review de novo the district court's grant of summary judgment. *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 964 (9th Cir.1999). "We must determine, viewing the evidence in the light most favorable to the party opposing the motion, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (citation omitted).

Summary judgment is proper on each of Desyllas's claims if there are no disputed material facts and if the Appellees are entitled to qualified immunity. *Id.* Government officials who perform discretionary functions generally are entitled to qualified immunity "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted).

The material facts are undisputed. In the relevant substantive law of qualified immunity, we must examine first whether the Appellees violated Desyllas's constitutional rights on the facts alleged and, second, if there was a violation, whether the constitutional rights were clearly established. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

## III.

We first address Desyllas's claims under the Fourth Amendment. Desyllas does not advance, and the record does not support, an allegation that he or the *Rearguard* office was searched. Desyllas does not claim that placing a clam shell lock on the *Rearguard* door constituted a seizure in violation of the Fourth Amendment. Desyllas contends only that he was unlawfully detained and that the box of confidential records was unlawfully seized. Desyllas's claim for unlawful seizure of the records derives from his primary claim that he was unlawfully detained.[1] Because we conclude that Desyllas was not detained in violation of the Fourth Amendment but rather remained voluntarily with the Appellees until deciding to give up the box of records of his own choosing, we need not address Desyllas's contention that the district court erred in dismissing his claim for unlawful seizure of the records.

When law enforcement officers detain a person but stop short of making an arrest, the Fourth Amendment mandates that the officers act reasonably in light of all the circumstances. *Terry v. Ohio*, 392

---

**1.** Desyllas essentially treated the two claims as one in the Appellant's Opening Brief. With respect to unlawful seizure of the records, Desyllas made no argument but rather stated only: "It follows that if the detention of Mr. Desyllas was in violation of the Fourth Amendment that his providing the box of documents to the administration was involuntary and was an unreasonable seizure of his papers, also protected by the Fourth Amendment." Appellant's Opening Brief at 25.

U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In assessing whether the Appellees violated Desyllas's Fourth Amendment rights, we must address first whether there was a detention within the meaning of the Fourth Amendment and second whether, if there was a detention, it was reasonable in light of the circumstances.

### A.

■ For purposes of the Fourth Amendment, detention or seizure of a person occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen ..." *Id.* at 19 n. 16, 88 S.Ct. 1868. "[M]ere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Consensual encounters with police likewise do not constitute investigatory stops. *See United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir.1994). "Questioning by law enforcement officers constitutes an investigatory stop only if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* (internal quotations omitted).

■ Desyllas was never told he was not free to leave the presence of Diman, Fowler and Soto. Desyllas did not request to leave their presence altogether. Rather, he only requested that he be allowed to leave the student government office twice—once to use the telephone and once to go outside to smoke—and he was allowed to do so both times. Desyllas was not shown a weapon or physically touched or restrained. Desyllas was informed of the possibility that a search warrant could be obtained, but a reasonable person would have interpreted that not as a threat

but rather as a fall-back option for university officials if Desyllas decided not to voluntarily give up the records. We therefore conclude that Desyllas was not detained within the meaning of the Fourth Amendment.

### B.

■ Even if Desyllas was detained, that detention was not unlawful if the Appellees' conduct was reasonable in light of all the circumstances. *Terry*, 392 U.S. at 19, 88 S.Ct. 1868. The determination of whether the Appellees' conduct was reasonable requires us to balance the government's need to detain Desyllas, if indeed he was detained, against Desyllas's interest in maintaining liberty and privacy. *Id.* at 21, 88 S.Ct. 1868; *see also Ganwich v. Knapp*, 319 F.3d 1115, 1120 (9th Cir.2003) (" '[We] balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable.' ") (quoting *Illinois v. McArthur*, 531 U.S. 326, 331, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001)). Government interests that may justify detention include crime prevention and detection as well as protection of the safety of law enforcement officers and others. *Terry*, 392 U.S. at 22–24, 88 S.Ct. 1868; *see also Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323 (9th Cir.1995).

■ In this case, the Appellees had a strong interest in recovering a box of confidential university records containing private information about former students. Among the 25 files in the box were medical records, mental health evaluations and disciplinary records relating to various forms of student misconduct. The Appellees contend that, in addition to their interest in recovering the box to avoid university liability for disclosure of student records in potential violation of federal[2] and

---

**2.** The Family Educational Rights and Privacy     Act of 1974 provides that federal funding may

state[3] law, they had an interest in enforcing Oregon's criminal statutes prohibiting theft.[4]

■ Given these asserted government interests, Desyllas was not unreasonably detained. Bernstine, Fowler and Diman acted only because Desyllas sent Bernstine an ambiguous letter advising of a "press conference." Bernstine's telephone records show that no more than 68 minutes passed between the time Diman and Fowler left Bernstine's office to speak with Desyllas and the time the student records were secured. Desyllas was not physically restrained nor prevented from making telephone calls. He did not undergo coerced interrogation, and his liberty was not contingent on handing over the confidential records. *Cf. Ganwich*, 319 F.3d at 1121. If Desyllas was detained, that detention was " 'carefully tailored to its underlying justification[,]' " *id.* at 1122 (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)), because Fowler and Diman remained with Desyllas only until he answered their question about whether he would willingly give them the box of confidential student records that Desyllas readily acknowledged belonged to the university.

Because Desyllas was not unreasonably detained, and because Desyllas voluntarily returned the box of records, the Appellees did not violate Desyllas's Fourth Amendment rights under the facts as alleged by Desyllas. Accordingly, we need not consider the second part of the qualified immunity analysis—whether the constitutional rights were clearly established. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. The district court properly concluded that the Appellees were entitled to summary judgment on Desyllas's unlawful detention and seizure claims.

## IV.

Desyllas's First Amendment claims address two separate contentions: first, that placing the clam shell lock on the door of the newspaper office violated Desyllas's right to investigate and publish news; and, second, that denying the opportunity to post notices in campus areas not approved for handbill-posting violated Desyllas's right to speak.

### A.

■ As a threshold matter it must be emphasized that generally the First Amendment imposes no requirements be-

---

be withheld from an educational institution "which has a policy or practice of permitting the release of education records ... of students without the written consent of their parents...." 20 U.S.C. § 1232g(b)(1). The statutory scheme does not create a private right of action for a student to sue under 42 U.S.C. § 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 276, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Nevertheless, maintaining the privacy of sensitive student records remains a significant government interest.

3. The Oregon statutes cited by Appellees do not appear to give rise to direct university liability. Rather, the statutes cited are permissive in nature, allowing the university to designate and maintain certain records as exempt from public disclosure requirements.

*See* Or.Rev.Stat. § 351.070(4)(e) (2001) (stating that the State Board of Higher Education shall adopt rules relating to the custody and disclosure of student records); *id.* § 192.502(8), (9) (exempting from public disclosure requirements any records prohibited from disclosure by federal and state law).

4. *See* Or.Rev.Stat. § 164.065 (2001) ("A person who comes into control of property of another that the person knows or has good reason to know to have been lost, mislaid or delivered under a mistake as to the nature or amount of the property or the identity of the recipient, commits theft if, with intent to deprive the owner thereof, the person fails to take reasonable measures to restore the property to the owner.").

yond those in the Fourth Amendment when law enforcement officers make an otherwise lawful investigatory stop of a journalist. *See Zurcher v. Stanford Daily,* 436 U.S. 547, 565, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) (stating that the First Amendment requires no more than compliance "with particular exactitude" with the Fourth Amendment when law enforcement officers obtain and execute a warrant to search newspaper offices); *see also Branzburg v. Hayes,* 408 U.S. 665, 682–683, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ("[O]therwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed."); *Associated Press v. NLRB,* 301 U.S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953 (1937) ("The publisher of a newspaper has no special immunity from the application of general laws."). Desyllas has cited no authority for the proposition that otherwise constitutional conduct under the Fourth Amendment may nevertheless violate the Constitution when the conduct affects a student newspaper and its editor.

■■ Desyllas cites *Scarce v. United States (In re Grand Jury Proceedings),* 5 F.3d 397 (9th Cir.1993), as "instructive" of his argument that the "lock down of the *Rearguard*"—presumably referring to the use of the clam shell lock—was a First Amendment violation. In that case, however, we held that a university professor was not entitled to a "scholar's privilege" not to testify before a grand jury about confidential information obtained during the course of researching a book. *Id.* at 403.

Even if the First Amendment or Oregon's exceptionally strong "shield law"[5] entitled Desyllas to a reporter's privilege protecting his news-gathering work, that privilege would no longer avail Desyllas because he voluntarily returned the box of confidential student records to Fowler, Diman and Soto. *See Farr v. Pitchess,* 522 F.2d 464, 468 (9th Cir.1975) (stating that a reporter's privilege may attach to a confidential news source's identity where the reporter refuses to voluntarily disclose the identity and where the First Amendment interests outweigh "the opposing need for disclosure").

Clearly, Desyllas does not argue that he is entitled to proceed on a claim for violation of the reporter's privilege. Similarly, he does not contend that the Appellees engaged in prior restraint of publication by censoring him or the *Rearguard.* Rather, he argues only that the Appellees' "bullying tactics" in locking the *Rearguard* door and questioning Desyllas amount to an abridgment of the freedom of the press.

This argument is totally devoid of support. The Appellees complied with the Fourth Amendment and did not interfere with the *Rearguard*'s publication of news. Desyllas remained free to write about the university's handling or mishandling of the confidential student records. He still remains in possession of the summary of the records he compiled and placed on the hard drive of his computer. Possession of the box, which Desyllas had for nearly three months without publishing a story, had no bearing on Desyllas's ability to publish a news story.

---

5. *See* Or.Rev.Stat. § 44.520(1)(b) (2001) ("No person connected with, employed by or engaged in any medium of communication to the public shall be required by a legislative, executive or judicial officer or body, or any other authority having power to compel testimony or the production of evidence, to disclose, by subpoena or otherwise ... [a]ny unpublished information obtained or prepared by the person in the course of gathering, receiving or processing information for any medium of communication to the public.").

Desyllas's First Amendment rights were not violated on the first of his two First Amendment claims. This being so, on this issue we need not address the second prong of the qualified immunity inquiry. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. We now turn to the campus limitation on posting handbills.

## B.

■ "[T]he standard by which limitations upon[speech rights on public property] must be evaluated differ[s] depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). We must first determine the character of the campus areas, such as the columns where Desyllas's fliers were posted, that are not approved under university policy for handbill-posting. Unlike the approved bulletin boards, the unapproved areas are not a public forum. *See DiLoreto*, 196 F.3d at 964 (noting that public fora such as public parks and sidewalks have traditionally been open to expression).

■ The areas that were not approved for posting fliers also are not designated public fora because the university did not intend to open them for expression, as manifested by the university's "Bulletin Board Posting Policy." *See id.* at 964 (noting that the classification of designated public fora hinges on the government's intent). Thus, the campus areas not approved for handbill-posting are nonpublic fora, and "[t]he government may limit expressive activity in nonpublic fora if the limitation is reasonable and not based on the speaker's viewpoint." *Id.* at 965 (citation omitted).

## 1.

■ We must now consider whether PSU's regulation of Desyllas's speech in the nonpublic forum was viewpoint-based. " '[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.' " *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (quoting *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). The Appellees engaged in impermissible viewpoint discrimination if "the specific motivating ideology or the opinion or perspective of the speaker [was] the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (citation omitted).

■ Even viewed in the light most favorable to Desyllas, the facts as alleged did not entitle Desyllas to overcome the Appellees' motion for summary judgment. That Rosenbloom saw Widner first removing Desyllas's press conference fliers and Students for Unity's movie night fliers, which were posted in violation of university policy, does not mean that the university targeted those fliers for viewpoint-based regulation. Indeed, the next time Rosenbloom checked, *all* the fliers had been removed. With respect to the selectively removed fliers elsewhere on campus, no allegation connects any of the Appellees to their removal. Desyllas has not produced facts that allege the Appellees removed only his fliers while allowing others to remain.

Thus, the facts are unlike those in *Giebel v. Sylvester*, 244 F.3d 1182 (9th Cir.2001), in which we held that a state university professor was not entitled to summary judgment based on qualified immunity where the professor had undisputedly removed only fliers advertising a presenta-

tion by a former colleague whose contract had not been renewed.

There is evidence that, although the university had a policy restricting fliers to approved bulletin boards, fliers were frequently posted and sometimes remained in nonapproved areas. Taken as true, Desyllas's allegations state only that the university was less than perfect, but not discriminatory, in its attempts to enforce a viewpoint-neutral—and content-neutral—speech regulation. *See DiLoreto*, 196 F.3d at 969. Thus the university complied with the first requirement for regulating speech in a nonpublic forum.

### 2.

█ Finally, we consider whether PSU's regulation of speech in the nonpublic forum was "reasonable in light of the purpose served by the forum ..." *Id.* This determination "focuses on whether the limitation is consistent with preserving the property for the purpose to which it is dedicated." *Id.* at 967 (citation omitted). The hallways, doorways and columns of the PSU campus are designated off-limits to fliers primarily for aesthetic reasons. The university's policy states that handbills shall not be posted in those areas because doing so causes damage. Widner's removal of Desyllas's press conference fliers, along with other fliers posted on the columns near Smith Center, is consistent with the university's purpose to preserve the appearance of campus structures.

The evidence does not support an allegation that the Appellees' conduct in taking down unapproved fliers, including those announcing Desyllas's press conference, was motivated by a desire to stifle Desyl-

las's particular perspective or opinion. We therefore conclude that the Appellees did not violate Desyllas's First Amendment rights. Accordingly we need not consider the second prong of the qualified immunity inquiry. *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

Because the Appellees were entitled to qualified immunity on both of Desyllas's First Amendment claims, we conclude that the district court properly granted summary judgment as to those claims.

\*     \*     \*     \*     \*     \*

For the foregoing reasons we hold that the Appellees were entitled to qualified immunity. The Appellees did not violate Desyllas's constitutional rights under the facts as alleged by Desyllas.

AFFIRMED.