Filed 2/10/15; unmodified opn. attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LEROY GUILLORY et al., | |
|    Plaintiffs and Appellants, | G047446 |
|       v. | (Super. Ct. No. 30-2008-00212410) |
| MICHELLE HILL, | ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |
|    Defendant and Respondent. | |

It is ordered that the opinion filed on January 16, 2015, be modified as follows:

1. On page 21, just before the start of Subsection B and at the end of the last sentence in the paragraph that begins "Second and related, . . . ," add a new footnote (the third footnote in the opinion), as follows: "In a rehearing petition, Hill suggests Bergman's guilty plea on charges of possessing illegal gaming equipment provides an independent basis for the trial court's directed verdict ruling against him because he may not collaterally attack his conviction with a civil claim of illegal or prolonged detention. We express no opinion on this contention because Hill did not raise it below and it was not a basis for the trial court's directed verdict ruling."

This modification does not effect a change in the judgment. The petition for rehearing is DENIED.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.

Filed 1/16/15; unmodified opinion

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LEROY GUILLORY et al., | |
| Plaintiffs and Appellants, | G047446 |
| v. | (Super. Ct. No. 30-2008-00212410) |
| MICHELLE HILL, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Gail Andrea Andler, Judge.  Reversed and remanded.

Eisenberg Law Firm and Mark W. Eisenberg for Plaintiffs and Appellants.

Lynberg & Watkins, Norman J. Watkins, S. Frank Harrell and Scott D. Danforth for Defendant and Respondent.

\*          \*          \*

---

\*      Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

LeRoy Guillory and 12 other plaintiffs appeal from the trial court's entry of judgment after granting Orange County Sheriff Department (OCSD) Investigator Michelle Hill's motion for a directed verdict (Code Civ. Proc., § 630) at the close of evidence in a six-week trial on plaintiff's civil rights claims.[1] (42 U.S.C. § 1983 (hereafter § 1983).) Plaintiffs consist primarily of Halloween partygoers who were swept up and detained as long as 14 hours in a predawn police raid on a mansion by dozens of Special Weapons and Tactics (SWAT) officers in armored vehicles. The party, an annual event with hundreds of costumed attendees, had drawn neighbor complaints over the years. Based in part on a flyer advertising a "Casino Room" at the party, together with information a confidential informant provided and other intelligence Hill gathered, she obtained a warrant to search for evidence of illegal gaming at the mansion.

The search yielded two slot machines that the party host, Carl Vini Bergman, claimed were unplugged and inoperable, along with three grams of marijuana in a partygoer's purse. After failing in his efforts to challenge the warrant in criminal proceedings, Bergman pleaded no contest to three misdemeanor counts of possessing prohibited gaming equipment. (Pen. Code, §§ 330a, 330b, 330.1.) In the course of the present civil litigation, several defendants including the various SWAT teams, unnamed "Doe" police officers, and County of Orange defendants dropped out, either by plaintiffs' failure to name the "Doe" defendants or by settlement or summary adjudication — leaving only Hill.

Among other asserted civil rights violations, plaintiffs contend Hill violated their right to be free from unlawful seizure by prolonging their detention beyond the

---

[1]    Besides Guillory, the other plaintiffs on appeal are: Carl Vini Bergeman, Lorraine Colarossi, Carmine Colarossi, Jennifer Bell, Altan Aksu, David Ryder, John D'Agostino, Kathleen D'Agostino, Scott Deere, Sr., Robert Green, and Darren Johnson.

conclusion of the search of the residence. Hill questioned each of the plaintiffs before deciding they were free to go, but according to plaintiffs, the jury could infer the officers had concluded the search of the premises well before Hill began her interrogations and later released plaintiffs. Plaintiffs contend nothing justified their detention beyond the end of the search.

The trial court was persuaded by defense counsel's arguments that (1) Hill's questioning could be construed as part of the search of the premises; alternatively that (2) Hill was entitled to qualified immunity because no authority "clearly established" she needed independent justification for the questioning if the search had ended; and (3) discovery of the slot machines and marijuana independently furnished a basis under *Terry v. Ohio* (1968) 392 U.S. 1 to detain and question all the plaintiffs. As we explain in the published portion of this opinion, these justifications fail under clearly established law, and because as a factual matter a jury reasonably could conclude the search had ended before Hill's questioning began, the trial court erred in granting the directed verdict. We therefore reverse the directed verdict as to plaintiffs' section 1983 claims based on prolonged detention.

In the unpublished portion of the opinion, we affirm the trial court's directed verdict on plaintiffs' other constitutional claims under section 1983, including the SWAT team and other officers' allegedly excessive force in entering and securing the premises, seizing two individuals near the premises but outside the scope of the warrant, searching two vehicles off the premises, restraining the detainees with excessive force before Hill questioned them, and damaging property during the search. As the trial court explained, "[I]n essence, plaintiffs sought to attach liability to Michele Hill for the acts of others and there was an insufficient factual showing, based on the applicable law, to

3

sustain the claims against her." We therefore affirm the judgment entered on the directed verdict as to those claims.

I

FACTUAL AND PROCEDURAL BACKGROUND

In a minute order following the directed verdict, the trial court summarized the background pertinent to its ruling. The court noted that Hill, "a veteran of the Orange County Sheriff's Department, obtained a search warrant . . . to search the 21,000 square foot home of plaintiff Vini Bergman, whom she knew to have a lengthy criminal history including numerous arrests for serious and violent felonies and a felony conviction for arson for which he spent time in prison. Her investigation also revealed that he had associations with members of the Hells' Angels and Mongols outlaw motorcycle gangs, and that he was planning to have a large party at his home in the hills of Santa Ana which was advertised as featuring a casino room and for which some attendees would be charged for admission. She also obtained the search warrant based on information from a confidential informant, and portions of the affidavit of probable cause were ordered sealed by the judge. The primary objective of the search warrant was to search for and seize evidence of illegal gaming.

"As the designated Case Agent, Investigator Hill conferred with her supervisor, and, pursuant to department policy, contacted SWAT to see if they would agree to assist in the service of the warrant. SWAT agreed that the warrant was properly classified as 'high-risk' based on the criminal history and associations of Mr. Bergman and the other factors related by Investigator Hill. The decision of whether SWAT would be utilized, and the tactics to be employed by SWAT, were ultimately made by SWAT. [¶] . . . [¶]

4

"The party took place, and at certain points during the evening swelled to 1000 people in attendance. People attending the Halloween Party were in costume and they congregated both inside and outside the home, as shuttles brought attendees up the hill. . . . The officers who were assigned to participate in the search warrant assembled at a local high school. The original [police] Game Plan called for the use of undercover officers to infiltrate the party in costume, but that plan was abandoned due to the difficulty faced by the undercover officers in getting to the residence due to logistics with shuttles and crowds.

"In the early morning hours, sometime between 4:00 am and 5:00 am, a caravan of SWAT officers, including armored vehicles, approached the residence with the investigative team following behind up the hill. A total of 100 SWAT officers entered the residence, in teams, to secure the residence, dressed in black or dark green with helmets, balaclava face masks, and weapons. Some of the more than twenty people still inside the residence were sleeping in the various bedrooms, others were on lower levels of the three story house cleaning up from the party. [¶]

"SWAT officers forcibly pulled occupants from beds and took others to the ground, using zip ties to restrain their hands behind their backs. The occupants did not initially realize that the persons entering the house were members of SWAT and some thought they were in danger of being robbed or hurt by masked assailants. It was a noisy, chaotic, and frightening experience. [¶]

"The goal of SWAT was to enter in such a manner as to overwhelm the occupants. One member of SWAT characterized the tactic as 'shock and awe' intentionally designed to overwhelm the occupants, thereby minimizing the likelihood of injury to officers or the occupants. All of the plaintiffs, except Mr. Green, were forcibly

5

restrained by SWAT and ultimately taken to the large living room where they were seated while the house was being further secured.  [¶]

"Much was made by counsel for plaintiffs regarding the manner of attire of the detainees during the search of the home, but none of the plaintiffs in the case were naked or covered with trash bags.  All of the plaintiffs were clothed in some fashion, as reflected by the photographs received in evidence.  The attire ranged from fully dressed in long-sleeved shirts and pants to two men in boxer shorts.  All of the women had at least nightgowns on, as reflected in the photographs.  None of them were topless or bottomless.  In the photograph displayed by her attorney to the jury during the trial, Mrs. D'Agostino appeared to be wearing a cotton t-shirt style nightgown with perhaps nothing underneath, although her body was not exposed except perhaps from the camera angle.  The manner of dress was not determined by Investigator Hill, who was not in the residence when the plaintiffs were brought into the living room.  There was no evidence that any plaintiff complained to Michelle Hill about their state of dress.  [¶]

"Investigator Michelle Hill and the members of the OCSD who were assigned to search the residence remained outside until SWAT announced that the residence had been secured and cleared for entry.  Investigator Michelle Hill was not part of the initial entry by SWAT and did not direct their entry, method of attire, or other tactics, although she advised [SWAT members] to cover their names to protect their identities.

"Investigator Hill and a team of approximately 40 officers, including two Sergeants, entered the residence approximately 45 minutes after the initial entry by SWAT.  Investigator Hill, as the case agent, addressed the detainees and explained that they were from the OCSD and were there . . . to carry out a search warrant.  Investigator

Hill was not a supervisor. She had a supervisor, a sergeant, on site. As [the] case agent, it was her job to coordinate the search and collection of evidence, and in that capacity she told other officers which rooms to search. [¶]

"She also coordinated interviews. She wanted the search of the 21000 square foot residence completed before [the] detainees were released; however, *some* detainees were interviewed and released before the search was completed. [Italics added.] [¶]

"The testimony varied regarding the requests of the plaintiffs for food, drink, and access to the bathroom during the time they were detained and were being supervised by other police officers. Mr. Bergman was tended to by paramedics on two occasions while he was detained, and testified that Investigator Hill allowed the paramedics to give him access to his insulin and that she offered him food, although it was not what he wanted to eat. . . . [¶]

"No arrests or citations were issued at the scene, although Mr. Bergman was later charged with a misdemeanor for the two slot machines which were seized in the search. He pled no contest to the misdemeanor charges."

The trial court omitted in its minute order any discussion of when the warrant search ended. According to plaintiffs, the search concluded by 7:00 a.m., i.e., within about two hours of SWAT's initial entry into the home. Plaintiffs piece together the testimony of two OCSD investigators to support their inference the search ended at 7:00 a.m. Narcotics investigator Larry Zurborg testified he believed all the detainees had their zip ties or handcuffs removed "*after* I was *done searching*." (Italics added.) Plaintiffs reason Zurborg's efforts were representative of the OCSD search team as whole, and therefore the whole search likely concluded about the same time Zurborg

finished searching. Plaintiffs also rely on Investigator Christopher Catalano's testimony that the detainees' "restraints were removed" within "an hour or so" after he entered the residence. Plaintiffs conclude that since Catalano entered the residence around 6:00 a.m. according to their calculation, the detainees' must have had their hands free by about 7:00 a.m. Relating this information back to Zurborg's observation the detainees' restraints were not removed until he completed his search, plaintiffs conclude that because Catalano observed the detainees without restraints by about 7:00 a.m., the search must have been completed by then.

According to defendant, the search for physical evidence did not begin until about 7:00 a.m. and, "[d]ue to the size of the house and the array of objects involved, some large and some very small, it took the investigative team approximately seven hours to complete the search." (Footnote omitted.) As defendant notes, "The warrant called for a search to locate a variety of items, [including] slot machines, money, financial documents, computer based information, business records, and other evidence of illegal gambling." Even assuming a seven-hour search, however, defendant concedes the interviews she conducted with the plaintiff detainees did not begin until "shortly *after* the conclusion of the physical search." (Italics added.)

Hill interviewed Robert Green, for example, at 2:16 p.m. According to plaintiffs, however, Hill did not release Green to leave the premises until between 4:30 and 5:00 p.m. Similarly, Hill conducted other detainee interviews at 3:00 p.m., 3:20 p.m., 3:42 p.m., 3:52 p.m., 4:08 p.m., 4:35 p.m, and 5:15 p.m., but according to plaintiffs, these detainees were not released immediately upon conclusion of their interviews. Instead, they had to wait variously until between 4:40 p.m. and 9:00 p.m. before Hill released them.

8

Apart from the prolonged detention issue, plaintiffs opposed the directed verdict motion on several other grounds. Plaintiffs argued that Hill developed the "game plan" for how to execute the search warrant. Based on information Hill learned from officers responding to routine noise complaints at the party and from other sources, plaintiffs argued she should have realized unleashing SWAT's entry with 100 officers was unreasonable and excessive. Though SWAT supervisors initially may have authorized use of their teams based on information before the night of the search, Hill should have scaled back the search to reflect the information she learned in hours of surveilling the premises well before SWAT's predawn entry. According to plaintiffs, the information that became "available to her . . . made it unnecessary for SWAT to be used; and [therefore] the force used was excessive . . . because Michele Hill failed to properly consider changed circumstances." Plaintiffs cite on appeal the testimony of a SWAT officer at the scene that the SWAT team could be ordered to "stand down."

Plaintiffs also argued below that a directed verdict was inappropriate based on a host of other violations committed during the search, all allegedly connected, like the initial SWAT entry, to Hill because she coordinated and effectively supervised the search. Plaintiffs alleged Hill was an "integral participant" in the violations, especially those that occurred in her presence or under her implicit direction. According to plaintiffs, Hill exercised de facto control over the search, whatever her official bureaucratic or nominal authority may have been, and her supervisors acquiesced in her effective control.

Thus, according to plaintiffs, Hill's search team improperly seized plaintiff Robert Green for a lengthy detention and eventual interrogation by Hill even though SWAT officers found him nearby but off the premises, outside the scope of the search

9

warrant.  The officers similarly seized Guillory, a minister, and held him to be interrogated by Hill even though his apartment on the premises had a separate postal address of 12606 and "1/2" Vista Panorama, distinct from the 12606 Vista Panorama address subject to the search warrant.  Hill's team also searched at least two vehicles belonging to the detainees she eventually interrogated, even though their vehicles were not parked immediately at the premises.

And plaintiffs further alleged the search team under Hill's effective and direct control:  (1) employed excessive force in detaining and readying plaintiffs for her questioning by employing zip ties and other restraints hours beyond any reasonable necessity; (2) violated basic norms of dignity by denying the detainees' use of the bathroom for hours, and by denying their reasonable requests for food, water, and medication before Hill questioned them; and (3) damaged the detainees' property without justification and beyond any reasonable necessity connected with the search.

The court declined to consider Hill's written directed verdict motion filed that day, or to allow plaintiffs to file a written opposition, and instead decided the directed verdict issue on Hill's oral motion and the plaintiffs' opposition.  "Based on the evidence submitted to this court as it relates to the acts and omissions of Michele Hill, and those that this court believes under the law can be properly attributed to her . . . , the court now does what it has never done before and grants the motion under section 630. [¶]  The court grants the motion for a directed verdict."  The court specified "that a directed verdict should issue in favor of Michele Hill as to the entire case, not in part."

The trial court noted, "So I know that you'll need a bit of time to digest what happened.  And it probably does come as a surprise to everybody.  Until I made the

10

ruling it comes as a surprise to me." The court directed the clerk to discharge the jury, enter the verdict, and enter judgment on the verdict. Plaintiffs now appeal.

II

DISCUSSION

Plaintiffs contend the trial court erred in directing the verdict in favor of defendant. (See Code Civ. Proc., § 630, subd. (a) [after close of evidence, "any party may . . . move for an order directing entry of a verdict in its favor"].) We review the trial court's entry of a directed verdict de novo. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210.) A directed verdict in favor of a defendant is proper if, after disregarding conflicting evidence and drawing every legitimate inference in favor of the plaintiff, there is "'no evidence of sufficient substantiality to support a verdict in favor of'" plaintiff. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1119 (*Wolf*).) In ruling on the motion, the trial court may not weigh the evidence, consider conflicting evidence or judge the credibility of witnesses. (*Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 395.) Appellate review of an order granting a directed verdict is quite strict, with all inferences and presumption drawn against such orders. (*Alshafie v. Lallande* (2009) 171 Cal.App.4th 421, 432.) The reviewing court must view the evidence in the light most favorable to the plaintiff, resolve all conflicts in the evidence and draw all inferences in plaintiff's favor, and disregard conflicting evidence. (*Wolf*, *supra*, at p. 1119.) Like the parties and the court below, we focus on plaintiffs' prolonged detention claim.

A.    *Prolonged Detention*

Plaintiffs contend the trial court improperly granted a directed verdict on their prolonged detention claim. We agree. Defendant mistakenly relies on law

11

enforcement's categorical authority to detain the occupants at a residence subject to a search warrant, without recognizing the very cases establishing this authority also limit the detention to the duration of the search. For example, the seminal high court case, *Michigan v. Summers* (1981) 452 U.S. 692, 705 (*Summers*), explained that "a warrant to search for contraband founded on probable cause implicitly carries with it the *limited* authority to detain the occupants of the premises *while* a proper search is conducted." (Italics added.) This authority derives from law enforcement's reasonable and legitimate interests in "preventing flight in the event that incriminating evidence is found," "minimizing the risk of harm to the officers" from uncontrolled occupants, and facilitating "the orderly completion of the search" with the detainees' aid, whose "self-interest may induce them to open locked doors or locked containers to avoid the use of force." (*Id.* at pp. 702-703.)

In *Muehler v. Mena* (2005) 544 U.S. 93, 98 (*Mena*), the high court emphasized that "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" Accordingly, the court reversed the Ninth Circuit's conclusion in that case that "the officers should have released Mena [an occupant caught up in the execution of a search warrant] as soon as it became clear that she posed no immediate threat." (*Id.* at p. 97.) To the contrary, her "detention *for the duration of the search* was reasonable under *Summers* because a warrant existed to search [the subject property] and she was an occupant of that address at the time of the search." (*Id.* at p. 98, italics added.) But the court also stated explicitly what was implicit in *Summers*: an occupant's "lawful seizure" during a warrant-backed search "'can become

12

unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" (*Mena*, at p. 101.)

Defense counsel suggested below that no "clearly established law . . . says that the term *search* has to exclude the interviews" (italics added), and counsel similarly invokes qualified immunity on appeal because "there was no clear body of law forbidding Hill's detention of Plaintiffs through the point of their interview at the time of the . . . search."

The doctrine of qualified immunity, however, does not aid defendant. "'Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. [Citation.]'" (*Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 116.) To determine if an official is entitled to qualified immunity, courts engage in a two-part inquiry. One component includes the basic question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" (*Saucier v. Katz* (2001) 533 U.S. 194, 201.) If a court determines "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." (*Ibid*.) But if the court concludes "a violation could be made out on a favorable view of the parties' submissions," the court must then ask "whether the right was clearly established . . . in light of the specific context of the case . . . ." (*Ibid*.) A court may begin with the second prong of the test: whether existing law clearly established the defendant's conduct was unconstitutional. (*Camreta v. Greene* (2011) __ U.S. __, 131 S.Ct. 2020, 2032; *Pearson v. Callahan* (2009) 555 U.S. 223, 236.)

13

Here, the specific conduct at issue is Hill's decision to hold plaintiffs for questioning well beyond the end of the physical search of the premises. A reasonable trier of fact could conclude on the evidence presented that the warrant search ended before Hill began questioning plaintiffs. Indeed, she testified that was her plan: to conclude the search and *then* interview the detainees. Accordingly, her own testimony indicated the detainee interviews commenced after the search was completed. Hill did not conduct her first interview until 2:16 p.m. Therefore, a reasonable factfinder could conclude the search ended shortly before that time, or ended much earlier at 7:00 a.m. as the plaintiffs assert. After her first interview at 2:16 p.m., Hill continued interviewing detainees throughout the afternoon and early evening. But she did not release *any* of the detainees until between 4:30 p.m. and 9:00 p.m.

Plaintiffs rely on *Center for Bio-ethical Reform v. City of Springboro* (6th Cir. 2007) 477 F.3d 807 (*Springboro*) for the proposition that an unduly prolonged police detention may ripen into a constitutional violation. (*Id.* at p. 828 [finding Fourth Amendment violation where, "[v]iewing the evidence in the light most favorable to Plaintiffs, the detention lasted two and one-half hours after the local officers completed their investigation"].) Defendant argues *Springboro* does not suffice to "clearly establish" the law because it postdated her interviews here. But defendant is wrong on the timing: *Springboro* was decided in February 2007, well before her Halloween 2007 interrogation of plaintiffs.

Defendant also contends *Springboro* is inadequate precedent to clearly establish the law because it hails from a different circuit and did not involve a search warrant, but rather a vehicle stop and ensuing investigation when police believed anti-abortion demonstrators were blocking a roadway. As we explain below, however, the

14

prohibition against prolonged detention is clearly established in this jurisdiction. And while "the right the official is alleged have violated must have been 'clearly established' . . . , [t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." (*Anderson v. Creighton* (1987) 483 U.S. 635, 640.) Defendant's suggestion below that qualified immunity applies because she was unaware of any cases involving a search warrant for "a 20,000 square foot house of this type" is therefore unavailing.

To the contrary, as the Ninth Circuit has recognized, the limiting language in *Summers* and *Mena* clearly established that detaining occupants beyond the end of a warrant-backed search is unlawful, absent independent Fourth Amendment justification. (See *Dawson v. City of Seattle* (2006) 435 F.3d 1054, 1066 ["We interpret the Supreme Court's language to mean that the duration of a detention may be coextensive with the period of a search, and require no further justification"].) Thus, *Dawson* explained that the Supreme Court has "rejected the notion that questioning a detainee 'constitute[s] a discrete Fourth Amendment event,' *unless the questioning prolongs the detention*." (*Id.* at p. 1068, italics added.) In *Mena*, for example, because the plaintiff's detention was *not* "prolonged by the questioning, there was no additional seizure within the meaning of the Fourth Amendment." (*Mena*, *supra*, 544 U.S. at p. 101.) But it followed that had "the questioning extended the time Mena was detained," independent, "additional Fourth Amendment justification" apart from the warrant would have been "required." (*Ibid.*) *Mena*, *Summers*, and *Dawson* all predated Hill's search, and clearly established that while questioning detainees *during* a warrant search may be lawful, the detainees may not be held beyond the end of the search absent independent justification.

Similarly, *Ganwich v. Knapp* (9th Cir. 2003) 319 F.3d 1115 (*Ganwich*) illustrated well before Hill's Halloween 2007 search that interrogating occupants detained during a search is *not*, as she claims, "part and parcel" of executing a warrant. According to Hill, a warrant search is incomplete and remains legitimately "in progress" until all occupants are interviewed. Not so. *Summers* upheld the detention of those present during a warrant search because "the type of detention here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through detention." (*Summers*, *supra*, 452 U.S. at 701.) In *Ganwich*, "the officers did precisely what the *Summers* court warned was improper: the officers exploited the detention, prolonging it to gain information *from the detainees, rather than from the search*." (*Ganwich*, at p. 1124, italics added.)

*Ganwich* explained this was clearly improper. There, the defendant police officers served a search warrant on a hearing aid business as part of an investigation into the company's allegedly fraudulent sales practices. The officers detained employees present during the search and advised them they were not under arrest, but that each "would be held in the waiting room until they submitted to individual interviews with police investigators in a back room." (*Ganwich*, *supra*, 319 F.3d at p. 1118.) As here, the detainees gained their release only after officers completed their interrogation. They were detained "for time periods ranging from one hour and forty-five minutes to four hours and forty-five minutes." (*Ibid.*)

The Ninth Circuit observed, "Although the defendants offer little explanation of what law enforcement interests this procedure might serve, it is plain that such questioning serves the government's proper interest in gathering information about

16

allegedly criminal activities.  This government interest may be important.  But it is not so important as to outweigh the plaintiffs' privacy rights, which the coerced interrogations severely invaded."  (*Ganwich*, *supra*, 319 F.3d at p. 1121.)  The court explained:  "The officers' conduct in the back room closely resembled the custodial interrogation that might take place at a police station.  We hold that this sort of coerced interrogation is a serious intrusion upon the sanctity of the person.  It may inflict great indignity and arouse strong resentment.  It may make the subject feel the target of the government's vast machinery, in grave legal peril, alone and without counsel.  It may make the subject feel that dread consequences hang on his or her words.  It may make the subject feel that silence is not an option.  The government surely has a legitimate interest in seeking voluntary cooperation from all.  But the government conduct in this case intruded so severely on interests protected by the Fourth Amendment as to be unreasonable and, therefore, unlawful.  Given the severity of the intrusion and the nature of the law enforcement interests at stake, the compelled interrogations of the plaintiffs were impermissible."  (*Id.* at pp. 1121-1122.)

The Ninth Circuit found no merit in the *Ganwich* defendants' argument "that the underlying justifications for detaining the plaintiffs were to prevent flight in the event incriminating evidence was found, to minimize the risk of harm to the officers, and to further the orderly completion of the search — the same justifications that made reasonable the seizures in *Michigan v. Summers*.  [Fn. omitted.]  Although these considerations amply justified the officers' ordering the plaintiffs to remain in the waiting room during the search of the premises, they did not justify the officers' coercing the plaintiffs into submitting to interrogations.  Therein the government's conduct went from fair to foul.  The interrogations did not deter the plaintiffs' flight, did not reduce the risk

17

of harm to officers, and did not assist the officers in the orderly completion of the search. Because the interrogations of the plaintiffs were not carefully tailored to the detention's underlying justification, the detention was more intrusive than necessary. This rendered the detentions unlawful." (*Ganwich*, *supra*, 319 F.3d at p. 1122.)

Here, Hill attempts to distinguish *Ganwich* on grounds that the mansion search produced incriminating evidence on which to interrogate the detainees.[2] In particular, the search yielded contraband consisting of a small amount of marijuana found in a purse in a bedroom where a guest was sleeping and one or more prohibited slot machines that, according to the plaintiffs' evidence, were unplugged and inoperable.

A well-targeted search warrant may be expected to yield evidence. But that by itself does not furnish officers with authority to further detain persons at the scene and require them to submit to questioning. As noted in *Summers* and *Ganwich*, a search warrant issues to collect evidence, not to elicit statements. Put another way, a magistrate's search warrant is directed at places to search, not people to interrogate. (*Summers*, *supra*, 452 U.S. at p. 701 ["the information the officers seek normally will be obtained through the search and not through the detention"]; *Ganwich*, *supra*, 319 F.2d at p. 1124 [improper to prolong detention "to gain information from the detainees, rather than from the search"].)

Hill also relies on police stops authorized in *Terry v. Ohio* to justify plaintiffs' continued detention beyond the end of the warrant search, based on the contraband recovered. (*Terry v. Ohio*, *supra*, 392 U.S. 1 (*Terry*).) Under *Terry* and its progeny, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal

---

[2]     Hill's motion to file typographical corrections to her letter brief addressing *Ganwich* is granted.

18

activity is afoot." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 123 (*Wardlow*).) To justify an investigative detention, the circumstances apparent to the officer must include specific and articulable facts causing the officer to suspect criminal activity has taken place or is about to occur, and the person detained is involved in that activity. (*Terry*, *supra*, 392 U.S. at p. 22.) "'Such detentions are permitted, notwithstanding the Fourth Amendment's requirements of probable cause and a search warrant, because they are "limited intrusions" that are "justified by special law enforcement interests." [Citations.]' [Citation.]" (*People v. Durazo* (2004) 124 Cal.App.4th 728, 734 (*Durazo*).)

For two clearly established reasons, the holding in *Terry* did not provide Hill with authority to hold the detainees for interrogation after the warrant search terminated. First, *Terry* does not authorize stopping and examining every person present where an officer believes a crime may have occurred. Instead, *Terry* requires individualized suspicion. (*Brown v. Texas* (1979) 443 U.S. 47, 51.) Without it, there is no basis to detain or continue to detain a person for questioning. For example, in *United States v. Ward* (9th Cir. 1973) 488 F.2d 162 (*Ward*), the court explained that the FBI's detention of a person without "a founded suspicion [of] criminal activity" was unconstitutional. (*Id.* at p. 169.) There, the agents stopped a person they did not suspect of criminal activity to question him about a third person. As the court later elaborated, "*Ward* clearly restricts investigative witness detentions by showing that in the hierarchy of state interests justifying detention, the interest in detaining witnesses for information is of relatively low value." (*Maxwell v. County of San Diego* (9th Cir. 2013) 708 F.3d 1075, 1084.) Here, the detainees' mere presence in the same large mansion where some limited drug and gaming contraband was discovered did not furnish the requisite individualized suspicion. (See *People v. Souza* (1994) 9 Cal.4th 224, 230 [temporary

19

detention requires "'objective manifestation'" that "the person to be stopped is engaged in that [criminal] activity"].)

Hill suggests plaintiffs' presence as invited overnight guests furnished evidence of their participation in a conspiracy to possess the marijuana and the gaming equipment. On review of a directed verdict, however, we must view the evidence in the light most favorable to the plaintiffs. (*Wolf*, *supra*, 162 Cal.App.4th at p. 1119.) A jury reasonably could reject the conspiracy claim as farfetched and unreasonable. Hill relies on the search team's discovery of two slot machines "within a fully furnished 'casino room'" and three grams of marijuana "in one of the bedrooms." She argues that "given their physical proximity to the slot machines and the marijuana alone, [she] could reasonably suspect Plaintiffs of unlawful conduct — and detain them under *Terry* for further investigation."

While Hill suggests artfully that the police discovered the marijuana "in a bedroom," the jury could conclude based on more specific testimony that it was found in a partygoer's purse. Nothing suggested it was for anything but her personal consumption or that it was an object of any conspiracy. Similarly, plaintiffs' claims the slot machines were unplugged and inoperable presented a factual scenario in which it would be unreasonable to suspect any of the plaintiffs of engaging in illegal gaming or a conspiracy concerning the machines. Evidence from the search of misdemeanor gaming and marijuana offenses (§§ 330a, 330b, 330.1; Health & Saf. Code, § 11357, subd. (b)) that did not implicate public safety gave Hill no basis to further hold and question *all* the detainees past the end of the search. This is particularly true where Hill points to nothing in the applicable Penal Code provisions (see *ante*) to suggest that a partygoer's *use* of the slot machines, if operable, was unlawful. A reasonable jury therefore could conclude the

20

notion partygoers intended to conspire to *possess* the machines was an unreasonable pretext to prolong the detentions.

Second and related, even assuming a *Terry* stop was justified as to any of the detainees, the nature of such a stop is a "brief" investigatory hold (*Wardlow*, *supra*, 528 U.S. at p. 123) that is of "limited" scope and duration. (*Durazo*, *supra*, 124 Cal.App.4th at p. 734.) Here, a reasonable jury could resolve the facts in a manner rendering *Terry* wholly inapplicable. Hill testified her plan from the outset was to conclude the search and then interview the detainees. She did not begin interviewing any of the plaintiff detainees until 2:16 p.m., and a reasonable factfinder therefore could conclude the search ended shortly before that time, or ended much earlier at 7:00 a.m. as the plaintiffs assert. Hill, however, did not release any of the plaintiff detainees until between 4:30 p.m. and 9:00 p.m. Plaintiffs' detention as long as 14 hours, and in some cases seven hours beyond Hill's own estimate of when the warrant search ended at 2:00 p.m., does not remotely resemble the brief detention authorized in *Terry*. It was therefore improper for the trial court to grant a directed verdict disposing of plaintiffs' prolonged detention claims.

B.     *Remainder of Plaintiffs' Claims*

Plaintiffs asserted a host of other constitutional claims under section 1983 related to the search and their detention. Specifically, they blamed Hill for alleged violations committed by the SWAT team and other officers, including excessive force in entering and securing the premises; seizing plaintiffs Green and Guillory near the premises but outside the scope of the warrant; searching two vehicles off the premises; restraining the detainees with excessive force before Hill questioned them, without regard

21

to basic dignity in attire or requests for water, to use the bathroom, or take medication; and damaging property during the search.

In executing a search warrant, law enforcement officers may take reasonable measures to secure the premises and may use reasonable force to detain the occupants. (*Los Angeles County v. Rettele* (2007) 550 U.S. 609, 614; *Mena*, *supra*, 544 U.S. at pp. 98-99.) They do not, however, have "unfettered authority to detain a building's occupants in any way they see fit," rather, the search and detention "must be conducted 'in a reasonable manner.'" (*Tekle v. United States* (9th Cir. 2007) 511 F.3d 839, 848; *Dawson*, *supra*, 435 F.3d at p. 1066.) The officers' conduct is evaluated "under an objective test, on the basis of the facts and circumstances confronting the officers." (*Franklin v. Foxworth* (9th Cir. 1994) 31 F.3d 873, 875 (*Franklin*).) Courts must balance law enforcement interests justifying the manner of search and detention against the intrusiveness of the invasion and the privacy interests of the persons detained. (*Dawson*, *supra*, 435 F.3d at p. 1066; *Ganwich*, *supra*, 319 F.3d at p. 1120.)

A detention conducted in connection with a search warrant may be unreasonable if it is unnecessarily painful, degrading, or if it involves undue invasion of privacy. (*Meredith v. Erath* (9th Cir. 2003) 342 F.3d 1057, 1062; *Franklin*, *supra*, 31 F.3d at p. 876.) A search or seizure outside the immediate premises identified in a search warrant may violate constitutional norms. (*Bailey v. United States* (2013) __ U.S. __, 133 S.Ct. 1031, 1042 [detention under search warrant is limited to immediate vicinity of residence; officers may not seize vehicle and occupants seen departing residence before warrant was executed].)

In granting Hill's motion for a directed verdict on the foregoing claims, the trial court observed generally that plaintiffs "sought to attach liability to [her] for the acts

of others." The trial court addressed some of the claims more specifically, as follows. Based on the evidence presented at trial, the court observed the SWAT team's initial entry and sweep to secure the premises "was a noisy, chaotic, and frightening experience," but "Investigator Michelle Hill was not part of the initial entry by SWAT and did not direct their entry, method of attire, or other tactics, although she advised [SWAT members] to cover their names to protect their identities."

The court also noted: "All of the plaintiffs, except Mr. Green, were forcibly restrained by SWAT and ultimately taken to the large living room where they were seated while the house was being further secured. Much was made by counsel for plaintiffs regarding the manner of attire of the detainees during the search of the home, but none of the plaintiffs in the case were naked or covered with trash bags. All of the plaintiffs were clothed in some fashion, as reflected by the photographs received in evidence. . . . The manner of dress was not determined by Investigator Hill, who was not in the residence when the plaintiffs were brought into the living room. There was no evidence that any plaintiff complained to Michelle Hill about their state of dress."

The court observed that "Investigator Hill was not a supervisor. She had a supervisor, a sergeant, on site." She "and a team of approximately 40 officers, including two Sergeants," entered the residence only after "SWAT announced that the residence had been secured and cleared for entry." It was Hill's "job to coordinate the search and collection of evidence, and in that capacity she told other officers which rooms to search. She also coordinated interviews. . . . The testimony varied regarding the requests of the plaintiffs for food, drink, and access to the bathroom during the time they were detained and were being supervised *by other police officers*. Mr. Bergman was tended to by paramedics on two occasions while he was detained, and testified that Investigator Hill

23

allowed the paramedics to give him access to his insulin and that she offered him food, although it was not what he wanted to eat."  (Italics added.)

The record is not clear whether plaintiffs sued the various SWAT teams and officers that participated in the raid, or whether those officers and entities were dismissed.  Defense counsel suggested at the hearing on the directed verdict motion that some claims against some entities including the SWAT teams may have settled, others were dismissed by an earlier summary adjudication, and that plaintiffs never amended their complaint to identify any of the individual "Doe" defendants except Hill. . In any event, the trial court concluded that apart from Hill's direct participation in questioning the detainees, she did not engage in any of the other unlawful conduct the plaintiffs alleged.  The court therefore granted Hill's directed verdict motion on those claims, finding she had no individual or supervisory liability.

The trial court did not err.  As the high court has explained, "'each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.'"  (*Ashcroft v. Iqbal* (2009) 556 U.S. 662, 693 (*Iqbal*).)  An officer or supervisor does not incur liability merely by association, but rather by "individual participation in the unlawful conduct."  (*Jones v. Williams* (9th Cir. 2002) 297 F.3d 930, 935.)  For a supervisor, that includes violations in which he or she actually "participated in or directed," and may include instances in which he or she "knew of the violations and failed to act to prevent them."  (*Taylor v. List* (9th Cir. 1989) 880 F.2d 1040, 1045; but see *Bayer v. Monroe County Children and Youth Services* (2009) 577 F.3d 186, 190, fn. 5 [suggesting that after *Iqbal*, "it is uncertain whether proof of [a supervisor's] personal knowledge, with nothing more, would provide a sufficient basis for holding [him] liable"].)  Here, the trial court properly granted a directed verdict disposing of plaintiffs'

24

theories apart from prolonged detention because no evidence showed Hill's direct participation or supervisory authority in the alleged violations.

Plaintiffs argue Hill was responsible for the SWAT team's alleged excessive force in raiding the residence with 100 officers. They acknowledge that while she applied for and obtained the search warrant, OCSD policy required Hill to contact SWAT authorities based on the potential risk factors in executing the warrant, including the size and scope of the property and the party, and Bergman's felony background and biker gang associations. They also acknowledge that once SWAT officials agreed based on internal SWAT criteria to enter and secure the premises, it was their responsibility to do so, not Hill's. But they rely on the testimony of a SWAT lieutenant that a SWAT team can be ordered to "stand down" if changed circumstances develop. Plaintiffs contend Hill learned from EMT personnel and others who visited the mansion during the course of the party that the patrons did not present a threat or otherwise justify the overwhelming force of a SWAT-style raid, and she failed to communicate this information to SWAT officials.

Plaintiffs do not explain the precise details of this alleged information, or how it could be definitive in determining SWAT's involvement was unnecessary, but more importantly it remains undisputed that the decision to execute the SWAT raid belonged to SWAT officials, not Hill. Any failure in command-and-control procedures to gather and account for developing information in a SWAT operation rests on those responsible for it, not on a third party. It is undisputed Hill had no authority herself to order the SWAT team to stand down, and therefore the trial court properly granted a directed verdict on plaintiffs' claims involving the SWAT raid.

This conclusion applies not only to SWAT's initial entry with overwhelming force into the property, but equally to the accompanying protective sweep. Plaintiffs complain that in securing the premises, the raiding team acted outside the scope of the search warrant by seizing plaintiff Green as he emerged from some bushes in party clothes just outside the residence, by seizing plaintiff Guillory from his apartment at the search location even though it had a separate address (designated by 2606 and "1/2" Vista Panorama), and by searching a vehicle in the driveway and another vehicle nearby. But even assuming arguendo that these actions were unlawful, no evidence showed Hill participated in or directed any of them. Rather, the undisputed evidence showed the responsibility for securing the premises lay with others, not Hill, and therefore the trial court properly granted a directed verdict on these claims.

Similarly, the evidence at trial showed Hill did not participate in or act in a supervisory capacity in any of plaintiff's claims of excessive force involving prolonged use of handcuffs or zip ties, nor in any dignity violations concerning the detainees' manner of dress or access to food, water, and medications, nor in any alleged property damage during the search. Plaintiffs suggested during the directed verdict hearing that simply because they were detained in the living room, a central area of the mansion that Hill likely could observe from her vantage point in the dining room, she knew of and was responsible for anything that occurred there. Not so. The mere fact that Hill served as the case agent who obtained the warrant and coordinated some aspects of the search, including questioning the detainees, did not make her responsible for everything that may have occurred during the search.

Two sergeants, including Hill's direct supervisor, outranked her in authority over the search, but plaintiffs never identified them as defendants. In any event,

26

even assuming Hill exercised control over some aspects of the search, the decision in *Young v. City of Visalia* (E.D. Cal., Aug. 31, 2012) 2012 WL 3778860 is instructive. There, the court explained:  "With respect to the manner in which [plaintiff] Young was actually detained [during a search], there is no indication that [search team supervisor] Marquez ordered [officer] Everett to keep Young in handcuffs and prevent Young from changing clothes, using the restroom, or accessing food, water, or medicine, nor is there evidence that Marquez knew about the manner in which Young would continue to be detained.  Without evidence that Marquez knew how Everett would detain Young or [that he] directed Everett how to detain Young, Marquez is not liable for the manner of Young's detention."  The same is true here for Hill, and the trial court therefore properly granted a directed verdict on plaintiffs' claims apart from the prolonged detention.

III

DISPOSITION

The judgment entered on the trial court's directed verdict is reversed as to plaintiffs' claims alleging prolonged detention under section 1983, and is affirmed in all other respects.  The parties shall bear their own appellate costs.

27

ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.